IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DR. PETER SLANE, DC, and
DIVINE HEALTH & NATURAL
HEALING LLC,                                              OPINION AND ORDER

                    Plaintiffs,                                   3:06-cv-00632-bbc

     v.

MASARU EMOTO, I.H.M. CO., LTD.,
HIRO EMOTO, and
HADO PUBLISHING USA,

                 Defendants.

---

Plaintiffs Peter Slane and Divine Health & Natural Healing LLC bring this action against defendants Masaru Emoto, I.H.M. Co., Ltd., Hiro Emoto, and Hado Publishing USA for intentional misrepresentation and violation of Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18. Plaintiffs allege that defendants intentionally misled them into purchasing two "Magnetic Resonance Analyzer" machines, named the Hado-R and Hadoscan, by falsely representing that the machines were capable of changing the physical properties of water in such a way that it could be used to heal sick patients. The parties are of diverse citizenship and the amount in controversy is greater than $75,000, making the exercise of jurisdiction appropriate under 28 U.S.C. § 1332.

Before the court are two motions brought by defendants: a motion for summary judgment on plaintiffs' claims of intentional misrepresentation and false advertising (counts I and II of the amended complaint) and a motion to strike or dismiss plaintiff's claim for breach of contract (count III of the amended complaint). Both motions will be granted.

Regarding the summary judgment motion, most of the statements upon which plaintiffs claim to have relied in deciding to purchase the Hado-R machine were published in books written by defendant Masaru Emoto. Because no jury could reasonably find that these statements were made with the intent to induce plaintiff to incur any obligation, they fail to support plaintiffs' claims of misrepresentation. As for other statements concerning the Hado-R, plaintiffs have failed to adduce evidence from which a jury could reasonably find that defendants intended to deceive them about the performance capabilities of the device when they made those statements or that those statements caused plaintiffs to purchase the device. With respect to plaintiffs' claims related to the Hadoscan machine, plaintiffs have failed to adduce evidence showing that defendants made false representations with respect to the performance capabilities of the device or that such representations were made with the intent of inducing plaintiff to purchase the device.

As for the motion to strike count III of the amended complaint, the breach of contract claim alleged in that count depends on the same alleged representations that underlie plaintiffs' fraud and false advertising claims. Because plaintiffs have failed to prove that such

2

representations were made, it would be futile to hold a trial on their newly-raised breach of contract claim.

A few preliminary matters require discussion.  First, although plaintiffs refer in their brief to exhibits attached to plaintiff Slane's affidavit in which he identifies more than 100 allegedly false statements made by defendants, plaintiffs' proposed findings of fact cite only a small subset of those statements.  (Defendants referred to the alleged statements in their motion for summary judgment and submitted them as an exhibit, but they did not propose any of the statements as findings of fact.)  Although plaintiffs suggest in their brief that the statements they have included in their proposed findings are merely "demonstrative examples" of the defendants' allegedly fraudulent statements, this court's procedures governing summary judgment make clear that "[a]ll facts necessary to sustain a party's position on a motion for summary judgment must be explicitly proposed as findings of fact." Helpful Tips for Filing a Summary Judgment Motion in Cases Assigned to Judge Barbara Crabb, attached to Second Preliminary Pretrial Conference Order on May 17, 2007, dkt. #23.  Those procedures also make plain that the court will not search the record for factual evidence.  In deciding the motion for summary judgment, therefore, I have considered only those communications that plaintiffs have specifically proposed in their findings of fact, which are the only statements on which plaintiffs focus in their briefs.

3

Second, many of plaintiffs' responses to defendants' proposed findings of fact include facts that plaintiffs did not propose in their own findings of fact or which are not directly responsive to the facts proposed by defendants.  In many of plaintiffs' responses, plaintiffs dispute defendants' characterizations of the facts as opposed to the facts themselves.  This is not an effective way to insure that facts are considered for purposes of summary judgment. When it is necessary for the nonmovant to go beyond disputing the other party's facts, it should propose its own findings of facts.  Procedure to be Followed on Motions for Summary Judgment in Cases Assigned to Judge Crabb, II.B., attached to dkt. #23.  With the exception of responses in which plaintiffs challenge defendants' characterization of a communication that no party disputes was made, I have considered only those facts in plaintiffs' responses that are responsive to defendants' proposed findings of facts.  Where the parties agree that a communication was made but disagree about the inferences to be drawn from that communication, I have quoted the relevant statements (at some length) from the record.

From the parties' proposed findings and the record, I find the following facts to be undisputed and material for the purposes of deciding the motion for summary judgment.

UNDISPUTED FACTS

A.  The Parties

Plaintiff Peter Slane is a 40-year old chiropractor and naturopath who lives in Madison, Wisconsin.  Plaintiff Divine Health & Natural Healing, LLC, is a Wisconsin limited liability company whose only owner and member is plaintiff.  (Because the claims of Peter Slane and Divine Health & Natural Healing, LLC are identical, I will refer to them collectively as "plaintiff" for the remainder of this opinion.)

Defendant Masaru Emoto is a citizen of Japan.  He is a Japanese author, philosopher and peace advocate.  He has written several books, including The Message from Water and The Hidden Messages in Water, in which he expresses his admittedly unconventional belief in the ability of water to memorize and transport information, including messages conveyed by written words, music or human thoughts.  In the books, Emoto asserts that experiments performed with high-speed, microscopic photography show that a bottle of water exposed to the words "thank you" and other "nice" words will form beautiful hexagonal crystals as it freezes, whereas water exposed to the words "fool" or similar "ugly" words produces malformed, fragmented crystals.  Emoto has conducted similar experiments with music, and claims that playing Bach or Beethoven to a bottle of water will produce nice-looking crystals, whereas playing heavy metal music to the water will cause it to form unattractive shapes. Emoto attributes this to "Hado," a phenomenon he has described in various ways, including,

5

"the energy or vibration inherent in all things" and "the world of subtle energy related to consciousness, synonymous with 'Chi' in Japanese."  (<u>The Hidden Messages of Water</u> was ranked 13th on the New York Times extended paperback advice bestseller list for the week of March 13, 2005.  At the time, it had sold 400,000 copies internationally.  Dwight Garner, "Inside the List," *New York Times*, March 13, 2005, available at http://www.nytimes.com/2005/03/13/books/review/013TBR.html.[1])

Defendant Hiro Emoto is Masaru Emoto's son and a resident and citizen of California.  Defendant I.H.M. Co. Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  I.H.M. Co., Ltd. is owned by Masaru Emoto and Kazuko Emoto, Masaru's wife.  The company markets and sells books, CDs, DVDs, bottled water, posters, stickers and health goods.  Defendant Hado Publishing USA (whose name has been changed to Hado Life USA) is a California corporation with its principal place of business in Torrance, California.  It is owned by Hiro Emoto and Kazuko Emoto.  Hado Life USA collects the commissions for all of Masaru Emoto's seminars and appearances in the United States.  Hado Life USA also sells water, Masaru Emoto's books, CDs, DVDs, posters, stickers, glassware, water bottles and cards.

---

[1] Garner described the book's best-seller status as a "head-scratcher" that "makes us question our sanity, or at least that of the American reading public."

B.  Plaintiff's Purchase of the Hado-R

Sometime before December 6, 2004, plaintiff read Masaru Emoto's books, The Message from Water and The Hidden Messages in Water.  On page 9 of The Message from Water, Emoto wrote:

>My first encounter with the study of water was when I became acquainted with Dr. Lee H. Lorenzen . . . Since the encounter with Dr. Lorenzen, I had become attracted to the study of water and wanted to know more about the properties of water.  I wondered if there were any machines that could measure and see water.  It was at this time that through Dr. Lorenzen, I learned about a machine that could measure HADO, called an MRA, Magnetic Resonance Analyzer.  It was after this discovery that my research started to advance with increasing speed.
>
>The MRA was used in the USA at that time for homeopathy (a popular alternative therapy in Germany).  The minute that I saw this machine, an idea flashed through my mind that it could be used in the study of "micro-cluster water" (Magnetic Resonance Water), so I brought it back to Japan as an instrument that could hopefully contribute to my research.  As a result, "HADO water" which transcribes HADO information by MRAs in micro-cluster water, that Dr. Lorenzen produced at my request, demonstrated that the physical condition of people can be improved by water.

The next reference to the MRA appears on page 121 of the book.  Emoto wrote:

>A machine, "MRA (Magnetic Resonance Analyzer)," which measures various states of HADO, encodes the unique energy pattern of each substance and checks whether it resonates or not, was first developed in the USA 12 years ago.

This machine that makes the measurement of HADO possible is called the Magnetic Resonance Analyzer (MRA).

On page 122, Emoto wrote:

HADO measuring instruments, including the MRA (currently, there are many types of HADO measuring instruments, including some domestic models), have HADO transcribing functions. The measurement first starts when the MRA puts out a faint resonance magnetic field, which is then transmitted to the subject and substances to be measured. Then the existence of resonance is checked. By amplifying the output of the measuring instrument HADO information can be transcribed.

The information is transcribed onto water because water has the highest retention capacity of information. We also tried transcribing and photographing an immunity code (HADO information of normal immune strength) on to tap water and dam water with the MRA.

Neither The Hidden Messages in Water nor The Messages from Water makes any mention of the Hado-R or Hadoscan.

Plaintiff began believing in Hado after he read The Hidden Messages in Water. On December 6, 2004, he contacted defendants by sending an email to info@hado.net. Plaintiff wrote:

I am a health care practitioner in the U.S. I practice naturopathic medicine. I have Dr. Emoto's books *Messages From Water*. How can I get a copy of "Prelude to the HADO Era" 1992 and Studies of the Human through Hado" 1994? Do you have information on buying a MRA (magnetic resonance analyzer) for treating ill patients?

8

At the time of his inquiry, plaintiff was aware that the concept of Hado, or "subtle energy," was an alternative to conventional scientific theories.  He did not know of any chiropractor or physician who utilized MRA machines to measure subtle energy for treatment purposes.

Defendant Hiro Emoto responded to plaintiff's email on December 7, 2004.  Emoto wrote:

> Regarding MRA, we don't sell this machine anymore.  The inventor of the machine is no longer working with us and we don't even know where he is now.  Our company in Japan sells the same kind of machine named Hado-R but if you buy this machine, you have to take a training to operate the machine in Japan and the staff can only teach you that in Japanese.  So it seems a little difficult to buy the machine for people outside of Japan.

Plaintiff replied the next day, December 8, 2004, with the following email:

> I understand that your company's HADO-R machine is only sold in Japan and needs training only in Japanese.  Let me make you an offer.  Sounds like you need a US distributor.  Does your company have the right to sell in US?  It doesn't need FDA approval if it is a research instrument.
>
> I have a history of selling research equipment to the US and International market for 10 years.  I could be your US distributor if I were trained with an interpreter.  Then I could train US clients.
>
> I am interested in this piece of equipment, because I have interests in consciousness and water.  I am a chiropractor and

naturopathic doctor.  Please forward this to your company who
sells the HADO-R machine.

At the time plaintiff offered to distribute the Hado-R in the United States, defendant I.H.M. had no plans to sell the Hado-R or any other Hado-measuring device in the United States.  Nonetheless, defendant Hiro Emoto responded to plaintiff's email and provided him with information concerning the Hado-R. (Although the printout of this email indicates that Emoto sent it on January 21, 2005, its content and those of other emails exchanged between him and plaintiff suggest that the date is inaccurate. The content of this email indicates that it was a direct response to plaintiff's email of December 8, 2004.  Furthermore, other emails suggest that the dates on the printouts of the emails did not accurately reflect the date the email was sent.  For example, in one email dated January 22, 2005, Hiro Emoto tells plaintiff that he was going to be in Japan from January 11-16.  Slane 002338, attached to dkt. #44, vol. I.  I have attempted to set out the parties' email exchanges according to the chronology that appears from the content as opposed to the dates.  To the extent this chronology deviates from that proposed by the parties, the discrepancy is immaterial.)  Emoto explained that in the past, I.H.M. had imported a patented MRA machine from a company in California.  However, after the inventor of that device disappeared, Emoto said, I.H.M. "started to make the MRA by ourselves in Japan."  Emoto explained that it might be possible to say that the Hado-R (the device now being used by I.H.M.) was different from the MRA

10

previously used because the two devices were operated differently; however, the "codes" for

the MRA and the Hado-R were the same.  He wrote:

> You told me that you sell research equipments for 10 years and
> if you can advise us, that will be great.  I am sure if Hado R can
> be sold in the U.S., a lot of people will be interested.  In
> addition, there will be a new book published by Masaru Emoto
> in April and this book introduces healing power of water and a
> lot of things about MRA.  So demand for Hado R will increase
> for sure.

On January 5, 2005, plaintiff sent another email to Hiro Emoto thanking him for the

background information and asking several follow-up questions.  Plaintiff indicated that he

had done some preliminary patent research regarding the MRA previously sold by I.H.M.

Plaintiff said that he knew associates who could research the legal and FDA implications of

importing the Hado-R.  Plaintiff stated that he was traveling to Florida for about six days but

in the meantime would continue to research the patents.

Emoto responded with answers to plaintiff's questions.  With respect to plaintiff's

statement that he was going to continue to research the patents for the MRA, Emoto wrote:

"Yes, please.  We would like to know what are the possibilities."

On or about January 14, 2005, plaintiff sent an email to Hiro Emoto.  Plaintiff said

that he had obtained the three patents held by the inventor of the previous MRA and had

read and analyzed them.  He asked Emoto several technical questions regarding the

11

differences between Hado-R and the MRA, if any, indicating that he needed this information in order to advise I.H.M. concerning the potential patent conflict with the MRA.

On Tuesday, January 25, 2005, plaintiff forwarded his résumé and curriculum vitae to Emoto. He told Emoto that he would like to "discuss further the possibility of bringing your Hado-R to the US and marketing and distributing it and using it clinically." Emoto responded on February 15, 2005. He asked plaintiff to re-send his previous email containing the questions about the Hado-R because he had lost the original message. Emoto stated: "I don't know how to operate MRA so I have to ask other people who know how to operate MRA to answer your questions."

On February 19, 2005, plaintiff sent an email to Hiro Emoto, proposing that they meet in Los Angeles on March 7 to discuss the potential of plaintiff's becoming the United States distributor of the Hado-R. Plaintiff stated, "I would love to develop a market plan and strategy for U.S. sales." On February 20, 2005, Emoto responded with answers to plaintiff's technical questions about the MRA, indicating that the information had been provided to him by someone else. Emoto reiterated that he did not know anything about the mechanism of either the MRA or the Hado-R. Emoto said that he would like to meet with plaintiff in Los Angeles on March 7, 2005. In the meantime, he said, he would be collecting information about the MRA and Hado-R.

12

Plaintiff met with Hiro Emoto in Los Angeles on March 7, 2005. Plaintiff brought with him a document he had prepared entitled "Hado-R Distributing," which contained an outline of topics he wanted to discuss. These topics included plans for an advertising campaign, steps to be taken related to the importability, patents, labeling and voltage requirements of the Hado-R and ideas about the Hado-R market. He also requested more information about the device, including an instruction manual or brochure, supporting data on health changes and other information that was needed in order to import the device into the United States. Plaintiff and Emoto also discussed plaintiff's need for Hado-R training.

In a follow-up email, Emoto told plaintiff that he was not sure where the training would be held because "IHM is located in Tokyo and the maker of Hado R is located in Osaka." The training was later set for April 11 and 12, 2005 in Tokyo. Emoto said that he was going to attend the training "to get knowledge about Hado R."

On May 22, 2005, Emoto sent an email to plaintiff in which he told him that in order to become a Hado distributor, plaintiff would have to attend a Hado instructor school. The group of individuals known as "Hado Instructors" include medical professionals, alternative health practitioners (such as chiropractors, acupuncturists, massage therapists, and reiki practitioners), educators, writers and others. (Currently, there are approximately 800 Hado Instructors, 500 of whom are in Japan and about 100 of whom are in the United States.)

13

Plaintiff attended the 1st Hado Instructor School in Torrance California on June 10-12, 2005.  At this seminar, plaintiff received a brochure written by defendant Masaru Emoto entitled "Expectations of Hado Instructors, USA."   In the document, Masaru Emoto described his expectations of Hado instructors as follows:

1.   Missionaries to spread Masaru Emoto's work

 People that will share the ideas of water crystals, vibration, music, words, Hado technology, free energy, and other ideas on behalf of Masaru Emoto.

2.   Practitioners of Hado healing technology

 People that will introduce, teach and operate not only Hado R machine but all available Hado measurement machines to heal those who are suffering under what the western medicine may consider incurable.

3.   Teachers at different workshops and schools

 People who will educate the world about the new Hado technologies and information that the other Hado instructors are constantly updating.

4.   Designers to spread the water crystal designs

 People that will produce new products inspired by the water crystal images in hope to fill the world with beautiful water crystals.

In the brochure, Emoto also stated that he was looking for people to create a newsletter and "take the leadership and manage all the above activities of Hado instructors."

14

At the seminar, Masaru Emoto gave plaintiff copies of his books, <u>Messages from Water Volume 2</u> and <u>Messages from Water Volume 3: Love Thyself</u>.  Plaintiff read those books on June 12, 2005.  In <u>Messages from Water Volume 2</u>, Emoto refers cursorily to the MRA device two times, once on page 34 and once on page 67.  At pages *ix-x* of <u>Messages from Water Volume 3:  Love Thyself</u>, Emoto provides a narrative account of how he first began to use the MRA to conduct "HADO measurements" and prepare Hado water.

On June 17, 2005, Hiro Emoto sent an email to plaintiff, stating that I.H.M was agreeing to pay plaintiff a $2,000 commission for each Hado-R that he sold and a $4,000 commission for each training session that he conducted.  In an email dated June 28, 2005, Emoto wrote to plaintiff and indicated that a Hado-R machine would be ready by mid-July but it might be longer before I.H.M. staff could translate the instructions and codes.  He asked when plaintiff would be able to pay for the device.

Plaintiff responded on July 4, 2005.  His email reads in relevant part as follows:

> Let me know when you are ready to ship Hado R.  I will pay by credit card no more than two weeks in advance of receiving.  You can ship without the instruction manual and then ship manual and codes later.  I have a copy of the instruction and codes except for spiritual and any other than are being translated . . . The sooner I get the Hado R the better . . . Also you said you had a copy of "Truth of Hado" translated on disk.  You were going to check on sending me this.  It would be very helpful to have Dr. Emoto's healing experience and words to train with and prompt the work.  I am sure some will want to know what kind of results your father obtained using Hado R.

On July 7, 2005, Hiro Emoto responded:

> I am checking with IHM when they can deliver the Hado-R and the conditions about Hado-G and I will get back to you as soon as I hear from them.
>
> Regarding the "Truth of Hado", actually, it is available to read on my father's website.  Please check this.

http://www.masaru-emoto.net/english/etruth.html

Plaintiff read "The Truth of Hado" on or about July 7, 2005.  The document consists of a series of eclectic entries in diary format spanning a range of topics, including Masaru Emoto's philosophies on life, musings on water, his explanation of the Hado Instructor System and a description of how the MRA device operated.

On July 20, 2005, Hiro Emoto wrote to plaintiff and told him that the Hado-R would be complete by August 1, 2005 and shipped to plaintiff "as soon as IHM receive[d] it from the maker."  Plaintiff paid $16,000 for the Hado-R in early August 2005.  On or about August 15, 2005, plaintiff received a Hado-R machine from I.H.M.

Plaintiff began using the Hado-R in his clinical practice.  On September 22, 2005, he sent an email to a group of Hado Instructors stating that he had been using the device on patients for one month and was "very impressed" with the technology.  Plaintiff wrote:

> It truly is amazing when you understand how it truly works and what level it is working on.  I have been able to do things with people I have not had success with before.  It is so exciting to watch people shift and step forward into their potential.

Plaintiff purchased three Hado-R machines from defendants two days before the 3rd Hado Instructor School held in Hilo, Hawaii on February 13-20, 2006.  At that school, plaintiff again discussed the Hado-R's remarkable results, citing as an example his treatment of a two-year old boy.  Plaintiff explained how the boy's behavior had improved after drinking Hado-treated water that was prepared on the basis of a Hado-R analysis that showed that the boy had high levels of lead and cadmium and low levels of germanium.

On March 9, 2006, the three Hado-R devices that plaintiff had purchased were delivered to him.  Plaintiff sold two Hado-R machines to Hado instructors for a profit of $12,000.

### C.  Plaintiff's Purchase of the Hado-Scan

In early April 2006, Hiro Emoto called or emailed plaintiff and told him that I.H.M. was no longer going to be selling the Hado-R machine.  Hiro Emoto told plaintiff that Masaru Emoto had met a man named Hans Schindler who manufactured another machine called an Etascan, that I.H.M. was going to pursue this machine and that the machine was to be renamed the Hadoscan.  In his e-diary entry of March 9, 2006, Masaru Emoto wrote that he had met with Schindler in Germany, where Schindler had performed an Etascan treatment on him.  Emoto wrote that by using the device, Schindler was able to detect and treat a problem with Emoto's pancreas.  Emoto titled the entry as "An encounter with what

may be the ultimate Hado measuring device" and claimed that the Etascan was "one of the most advanced Hado devices that I have ever come across."  Plaintiff read this entry sometime before June 2006.

Hiro Emoto told plaintiff that I.H.M. was interested in asking plaintiff to be the distributor of the Hadoscan in the United States.  He told plaintiff that Masaru Emoto wanted plaintiff to meet with Schindler in Los Angeles to check out the machine.  Sometime in April or May 2006, plaintiff met Schindler in Los Angeles for this purpose.  However, plaintiff was not able to see how the Hadoscan worked because the machine that Schindler had brought with him was not working.

In June 2006, Schindler conducted a three-to-four day training session on the Hadoscan in New Jersey.  Schindler trained plaintiff, a Hado instructor named J.P. Behar, defendant Hiro Emoto and other members of I.H.M. staff, including Yasuyuki Nemoto. Schindler did not train defendant Masaru Emoto on the Hadoscan during that session. Plaintiff performed a Hadoscan test on Nemoto, which detected a problem in Nemoto's neck.  Plaintiff found this result to be significant, because he had detected the same problem by performing a different, non-Hado related test on Nemoto.  During the Hadoscan training session, plaintiff had many discussions with Schindler about how to use the device.

Immediately after this training session, the 4th Hado Instructor School took place, including an "optional day" for Hado instructors.  Sometime during the school, which ran

18

from June 6-16, 2006, Masaru Emoto claimed that the Hadoscan had helped heal his pancreas.  He also said that the Hadoscan was a breakthrough in Hado measuring devices because it could measure the Hado of words. During the optional day, plaintiff began training Hado instructors on the use of the Hadoscan.

After plaintiff completed the New Jersey instructor school, Hiro Emoto provided him with a Hadoscan.  Shortly thereafter, Schindler sent three more Hadoscan machines to plaintiff to be used as demonstration models at a Las Vegas expo in July 2006.  Plaintiff eventually sold two Hadoscan machines for $4,000 each.

Between June 19, 2006 and October 19, 2006, plaintiff sent at least five emails to Schindler in which plaintiff asked questions about the technical aspects of the Hadoscan. Plaintiff did not ask any of the defendants technical questions about the Hadoscan because he knew that Schindler knew the most about the device.  Whenever Hiro Emoto received any technical questions that related to the use of the Hadoscan, he would forward them to plaintiff to answer.

In October 2006, plaintiff conducted a training session on the Hadoscan in Madison, after which he sold 12 or 13 of the machines.  That same month, I.H.M. invited plaintiff to travel to Japan to train I.H.M.'s staff on the device.

On October 19, 2006, plaintiff discovered that the Hadoscan was non-functional. (Plaintiff has not adduced any facts that explain how he made this discovery.)  On October

19

26, 2006, plaintiff sent a letter to Hirotsugu Hazaka, president of I.H.M., telling him that the Hadoscan was a "fake and a fraud, and a "pre-programmed toy incapable of doing any of the functions that it claims to be able to do." On October 27, 2006, plaintiff wrote to Nemoto, explaining that the device would produce the same results so long as the same name and age were entered, even several days or a week later. In the email, plaintiff accused Schindler of defrauding Masaru Emoto and I.H.M., indicating that he suspected that Schindler had pre-programmed the device to reflect "weak pancreas" when Masaru Emoto's name was typed in.

In response to plaintiff's letter, Hazaka sent an email to plaintiff in which he stated that I.H.M. was conducting various tests on the Hadoscan to find out whether parts of it were usable. He indicated that I.H.M. was still working on improvements to the device and that the company had not yet sealed a deal with Schindler. Hazaka wrote that he was "moved by the wonderfulness of some parts" of the device, but he did not consider it to be a machine for treating illness. Rather, he explained, the machine was for the purpose of "self-enlightenment" and to "search emotional HADO." Hazaka explained: "Although [the Hadoscan] also has a function to transfer information into the water, the level of this function is something like, it works if you believe in it but it doesn't work if you don't."

On March 28, 2007, defendants had Schindler on the agenda to speak at the Hado Instructor School which took place on April 29, 2007. The Hadoscan was renamed the

Hado Astrea.  I.H.M. is currently selling the Hado Astrea.  I.H.M. was still advertising Hado-R devices on the website www.hado.com as late as June 2007.


OPINION

A.  Summary Judgment Standard

The standards for summary judgment are well known.  Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Weicherding v. Riegel, 160 F.3d 1139, 1142 (7th Cir. 1998).  If the non-movant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the non-moving party.  Sample v. Aldi, Inc., 61 F.3d 544, 546 (7th Cir. 1995).

B.  Hado-R

1.  Elements of the claims

To prove his claim of intentional misrepresentation, plaintiff must establish the following:  (1) defendants made a factual representation; (2) which was untrue; (3) defendants either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) defendants made the representation with intent to defraud and to induce plaintiff to act upon it; and (5) plaintiff believed the statement to be true and relied on it to his detriment.  Kaloti Enterprises, Inc. v. Kellogg Sales Co., 2005 WI 11, ¶12, 283 Wis. 2d 555, 569, 699 N.W.2d 205, 211 (2005); Tietsworth v. Harley-Davidson, Inc., 2004 WI 32, ¶13, 270 Wis. 2d 146, 677 N.W. 2d 233. (The parties agree that Wisconsin law applies, so I dispense with a choice of law analysis. FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002)).  To prove that defendants violated Wis. Stat. § 100.18, plaintiff must prove the following:

> (1) With the intent to induce an obligation, defendants made a representation to the public regarding the purchase, sale, or use of merchandise, real estate, securities, employment or service;
>
> (2) the representation was untrue, deceptive or misleading; and
>
> (3) the representation caused plaintiff to suffer a monetary loss.[2]

---

[2] The full text of the statute reads as follows:

No person, firm, corporation or association, or agent or employee thereof, with

22

Wis. JI-Civil 2418; <u>K&S Tool & Die, Co. v. Perfection Machinery Sales, Inc.</u>, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W. 2d 792.

Before examining the statements that plaintiff says defendants made that caused him to purchase the Hado-R device, it is necessary to clarify what statements are at issue. I do not agree with defendants' contention that only statements referring specifically to the Hado-R are actionable. As plaintiff points out, Hiro Emoto indicated in his emails to plaintiff that the Hado-R was the same kind of machine as the MRA previously sold by I.H.M. and that it had the same codes. Given the similarity of the two devices, plaintiff

---

intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

could have relied reasonably on statements referring to the MRA in deciding to purchase the Hado-R.

As noted in the introduction to this opinion, apart from representations made by Emoto in his books, plaintiff has identified very few statements that purportedly misled him to purchase the device. Although he has averred generally that "it was not only the books that led [him] to become a Hado Instructor, but rather he was induced to do so through a combination of the Defendants' DVDs, books, seminar materials, trainings, and brochures," apart from the books, he has identified only two documents other than Emoto's books that contain statements that allegedly induced him to act: 1) Masaru Emoto's "The Truth of Hado" and 2) "The Expectations of Hado Instructors USA." In considering whether plaintiff has met his burden of showing the existence of a genuine dispute for trial, I have considered only those two documents and Emoto's books.

A note of clarification is also required with respect to the books. Although the parties' proposed findings of fact indicate that plaintiff read The Hidden Messages in Water and The Message from Water before December 6, 2004 and Messages from Water Volume 2 and Messages from Water Volume 3: Love Thyself on June 12, 2005, no party has proposed any facts about when, if ever, plaintiff read The True Power of Water, a book written by Emoto and published in 2005. Although plaintiff makes a number of arguments related to The True Power of Water in the course of arguing that all of Emoto's books were part of a

24

commercial scheme by defendants to induce readers to buy MRA devices, nowhere does he adduce any evidence showing when, if ever, he read that particular book.  Absent evidence that he read the book before he purchased the Hado-R, a jury would have no reason to conclude that he was defrauded as a result of statements made in the book.  Accordingly, summary judgment will be granted to defendants to the extent plaintiff is alleging that he relied on statements made in The True Power of Water.

2.  Statements by Masaru Emoto about the "MRA" in his books

Defendants argue that plaintiff cannot maintain a misrepresentation action on the basis of Emoto's statements in his books because those statements are noncommercial speech, that is, they do not propose any commercial transaction with respect to the Hado-R or any other Hado-measuring device.  Although the parties have framed this issue in terms of the First Amendment, see Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65 (1983) (noncommercial speech is afforded full First Amendment protection, whereas commercial speech that is false or misleading is entitled to no protection), it is unnecessary to decide the issue on constitutional grounds.  If no reasonable reader would view Emoto's books as an attempt to market an MRA machine, then no reasonable jury could find that Emoto had the intent necessary to support plaintiff's claim for intentional misrepresentation.  Tietsworth, 2004 WI at ¶ 13 (tort of intentional misrepresentation requires that defendant have intent

25

and purpose to induce plaintiff to act on false statement to his detriment); Goerke v. Vojvodich, 67 Wis. 2d 102, 207, 226 N.W. 2d 211 (1975).  Because deciding whether a speaker had the intent to induce an obligation depends on the same facts that would be relevant to a "commercial speech" inquiry, I have considered the competing arguments raised by the parties about the commercial or non-commercial nature of the statements at issue in the context of determining whether a genuine dispute of fact exists concerning Emoto's intent at the time he made his statements.

Plaintiff makes no argument that any statement published in Emoto's books about the MRA contains an outright attempt to market the device.  Instead, he argues that the books "lay the groundwork for a commercial scheme" by creating an interest in the healing power of water and the MRA devices, which, in turn, created demand for the Hado-R. Plaintiff equates the circumstances in this case with those at issue in United States v. Schiff, 370 F.3d 621, 627-28 (9th Cir. 2004).  In that case, the court upheld an order enjoining Irwin Schiff, a recidivist income tax evader, from selling a book called The Federal Mafia: How the Government Illegally Imposes and Unlawfully Collects Income Taxes, which contained statements that could mislead consumers into believing that they could use Schiff's products to legally stop paying income taxes.  Addressing Schiff's claim that his book was entitled to the full scope of the First Amendment's protection, the court found that the book was the "linchpin" in Schiff's entire line of tax avoidance products and services because

26

the extravagant claims in the book were "designed to convince readers that they can lawfully avoid paying their income taxes so that the readers will buy other products in Schiff's line." Id. at 627.  Among other things, the court noted that the book contained an insert showing the prices for various books, tapes and videos, and offering "package deals" on various products in Schiff's line.  The court also noted that Schiff's website made plain that the book played an "integral part" in Schiff's whole financial program because it advertised The Federal Mafia as the "starting point" for learning how to avoid paying income taxes, while simultaneously urging readers to buy Schiff's other products.  Id. at 628-29.

Contrary to plaintiff's contention, the facts of this case bear little resemblance to those in Schiff.  No statement in any of the books proposes a commercial transaction with respect to any hado-measuring device or suggests that the books are the "starting point" in learning about MRA technology or becoming a Hado Instructor.  In The Hidden Messages of Water and The Messages in Water, Emoto mentions the MRA almost in passing.  In fact, the books do not make it clear just how the MRA relates to Emoto's pictures of frozen water crystals, which form the bulk of the books.  Emoto describes his own experiences with the machines, but he does not exhort anyone to become a Hado instructor, promote the MRA as a device necessary to health or suggest that it was a product that could be purchased, much less encourage someone to buy one.  It is plain from a review of the books that their

27

main purposes are to convey Emoto's idiosyncratic thoughts and beliefs on water, subtle energy and consciousness and to display his water crystal photographs.

Plaintiff points out that the last four pages of The Hidden Messages in Water and its sequel, The True Power of Water, are dedicated to advertising defendants' products, including CD's, water bottles, coasters, and DVD's. However, these pages constitute a tiny portion of each book: The Hidden Messages in Water is 161 pages long and The True Power of Water is 173 pages long. Even if defendants were seeking to create demand in their other products by advertising them at the back of the books (a sales tactic common among publishers), the advertisements do not make the main message of the books commercial. Bolger, 463 U.S. at 6 (noncommercial speech does not lose First Amendment protection merely because it contains reference to specific product). Furthermore, the fact that defendants were advertising other products and *not* an MRA shows the absence of an intent to induce readers to buy an MRA.

As proof that defendants intended the books to create consumer interest in the Hado-R, plaintiff points to a statement by Hiro Emoto in January 2005 in which he indicated that "demand for hado R" would definitely increase after the publication of The True Power of Water in April. However, furthering defendants' economic interests does not transform the otherwise non-commercial statements in the book into an inducement to purchase the device. What's more, any conclusion that defendants wanted The True Power of Water to

28

generate consumer interest in the Hado-R is undermined by the book itself.  On page 24, Masaru Emoto states that he is "not recruiting students" and "not accepting inquiries about [the MRA] device."  On page 103, he explains that any person can make her own "personalized hado water" simply by talking to a bottle of distilled water or showing it words such as "love and gratitude" written on a piece of paper.  If Emoto intended to induce his readers to purchase a hado-measuring device, as plaintiff contends, why would he say that none were available for purchase and that in any case, one was not really necessary?  In any event, whether The True Power of Water contained such an inducement is irrelevant because plaintiff has adduced no evidence that he relied on any of the statements in that book in deciding to purchase the Hado-R.

Plaintiff attempts to further his "commercial scheme" argument by pointing out that in The Message from Water, Emoto referred readers to "The Truth of Hado" for specific details about the MRA.  Plaintiff argues that Emoto made statements in "The Truth of Hado" document that are commercial in nature, claiming that Emoto "described the promotion, training, marketing, and selling of Hado devices."  But this is at once an overly broad and unduly narrow construction of the document.  The document consists of a series of unrelated entries in diary format, spanning topics from reader reviews of Emoto's books to Emoto's thoughts on the supernatural.  Plaintiff focuses on the entries that relate to the MRA and to Hado Instructor Schools, but these constitute less than half of the document's

29

29 entries.  Emoto does write that one of the specific tasks for Hado instructors is to "[a]cquire accurate understanding of all products authorized by head quarters and sales methods to those products," and he explains that he set up the schools after selling MRAs to people who did not use them appropriately.  However, nowhere in the document does Emoto provide information about how to enroll in a Hado Instructor School or propose any commercial transaction with respect to an MRA or any other "Hado product."  Reading the document as a whole, I am satisfied that its purpose was not to market and sell MRAs or other products.  It follows, then, that there is no basis on which to find that Emoto was attempting to induce readers to purchase an MRA when he referred to "The Truth of Hado" in The Messages in Water.

In sum, I find that defendant Masaru Emoto's books contain no statements from which a jury could find that Emoto wrote his books to induce readers to purchase an MRA device.  Plaintiff's "commercial scheme" argument is simply not supported by any reasonable reading of the publications in question.  Accordingly, defendants are entitled to summary judgment on plaintiff's claim that defendants committed fraud by publishing false statements about the MRA in Emoto's books.  The conclusion that the books are noncommercial in nature also defeats plaintiff's claim pursuant to Wis. Stat. § 101.8, for that statute applies by its terms to commercial transactions.  State v. Automatic Merchandisers of America, Inc., 64 Wis. 2d 659, 665, 221 N.W.2d 683, 686-87 (1974)

30

("Sec. 100.18(1), Stats. is aimed at protecting the public from untrue, deceptive or misleading representations made in sales promotions").

2.  Statements by Masaru Emoto in other publications

As noted previously, apart from Emoto's books, plaintiff has identified only two other sources of information about the Hado-R that he says contributed to his decision to purchase the device:  1) "The Truth of Hado" document; and 2) "The Expectations of Hado Instructors USA" document, written by Emoto, that plaintiff received at the first Hado Instructor School that he attended in June 2005.  Plaintiff argues that the representations made by Emoto in "The Truth of Hado" concerning the mechanism of the MRA became commercially significant on July 7, 2005, when Hiro Emoto "directed" plaintiff to read the document "in response to plaintiff's request for more detailed information regarding MRA device functions."

Plaintiff's assertion is not an independent fact but a hotly disputed characterization of Hiro Emoto's email to plaintiff on July 7, 2005.  One need only read Hiro Emoto's email in context to see that defendants are correct.  Hiro wrote his July 7, 2005 in response to an email that plaintiff had sent on July 4, 2005.  Plaintiff's July 4, 2005 email reads, in part, as follows:

31

> Let me know when you are ready to ship Hado R. I will pay by
> credit card no more than two weeks in advance of receiving.
> You can ship without the instruction manual and then ship
> manual and codes later. I have a copy of the instruction and
> codes except for spiritual and any other than are being
> translated . . . The sooner I get the Hado R the better . . . Also
> you said you had a copy of "Truth of Hado" translated on disk.
> You were going to check on sending me this. It would be very
> helpful to have Dr. Emoto's healing experience and words to
> train with and prompt the work. I am sure some will want to
> know what kind of results your father obtained using Hado R.

On July 7, 2005, Hiro Emoto responded as follows:

> I am checking with IHM when they can deliver the Hado-R and
> the conditions about Hado-G and I will get back to you as soon
> as I hear from them.

> Regarding the "Truth of Hado", actually, it is available to read
> on my father's website. Please check this.

> http://www.masaru-emoto.net/english/etruth.html

Read in context, no reasonable finder of fact could infer that in telling plaintiff where

he could read "The Truth of Hado," Hiro Emoto did so to induce plaintiff to rely on the

statements about the MRA device functions therein, and in turn, to purchase a Hado-R.

Tietsworth, 2004 WI at ¶ 13 (tort of intentional misrepresentation requires that defendant

have intent and purpose to induce plaintiff to act on false statement to his detriment). To

the contrary, Emoto was merely responding to plaintiff's inquiry about where to get the

document. Further, plaintiff's July 4 email indicates that he made this inquiry not because

*he* wanted "more detailed information regarding MRA device functions" in order to decide whether he would purchase a Hado-R, as he now suggests, but rather so that "others" could find out about Masaru Emoto's experiences with the device.

Not only does the email exchange between plaintiff and Hiro Emoto defeat plaintiff's contention that a jury could find that Emoto "directed" him to The Truth of Hado" to induce him to purchase the Hado-R, but it refutes any reasonable inference that plaintiff could have relied on anything he read in "The Truth of Hado" in deciding to purchase the Hado-R. To prove his claim for intentional misrepresentation, plaintiff must show that he actually relied upon the misrepresentation, that is, that he would not have acted in the absence of the alleged misrepresentation. Wis. JI-Civil 2401. Plaintiff's statement that "the sooner I get the Hado-R, the better" and his agreement that the device could be shipped without a complete instruction manual is a virtual admission that he had already decided to purchase the Hado-R *before* reading "The Truth of Hado."   Indeed, plaintiff concedes as much in his affidavit when he avers that he did not make up his mind to purchase the Hado-R until Emoto promised him the technical details would be coming soon.  Plt.'s Additional Proposed Findings of Fact, dkt. #50, ¶ 23.  The email exchanges between plaintiff and Emoto indicate that that promise was made in late June 2005, before plaintiff read "The Truth of Hado."

This leaves the "Expectations of Hado Instructors USA" brochure that plaintiff received between June 10-12, 2005.  In it, Masaru Emoto stated that Hado instructors were expected to "introduce, teach, and operate not only Hado R machine but all available Hado measurement machines to heal those who are suffering under what the western medicine may consider incurable," "educate the world about the new Hado technologies" and "produce new products inspired by the water crystal images."  Unlike Emoto's books and "The Truth of Hado" document, this brochure reasonably could be viewed as intending to promote defendants' economic interests, one of which was the marketing of the Hado-R.

Nonetheless, plaintiff has failed to adduce sufficient evidence from which a jury could find that he was defrauded by the statements in the "Expectations" brochure.  Plaintiff alleges in his amended complaint that he was harmed as a result of his reliance on defendants' false representations "regarding the diagnostic and treatment capabilities of the Hado-R and Hadoscan MRA machines and their abilities to modify water and other substances for healing purposes."  Amended Cpt., dkt. #37, ¶¶109-15.  In his affidavit, he avers that he was induced to rely on defendants' "representations that the Hado-R actually measures vibrations and could change the physical properties of water, and diagnose and treat illness."  Aff. of Plt., dkt. #52, ¶16.  But "The Expectations of Hado Instructors USA" does not contain any representations that the Hado-R had this capability.  The brochure contains the implication that the Hado-R could "heal those who are suffering under what the

34

western medicine may consider incurable," but it does not specify how the device would accomplish that healing.  Because plaintiff has alleged that he was harmed because of what defendants purportedly told him about *how* the device operated to heal illness and has not alleged that he was harmed because of general claims that the device could heal people, there is no basis on which to find that plaintiff was defrauded by any statements in "The Expectations of Hado Instructors USA" brochure.

In summary, plaintiff has failed to adduce any evidence from which a jury could conclude that defendants made false statements about the performance capabilities of the Hado-R that were intended to induce plaintiff to purchase a Hado-R or that the allegedly false statements that were made actually caused plaintiff to make that purchase. Accordingly, defendants are entitled to summary judgment on plaintiff's claims with respect to the Hado-R.

## C.  Hado-Scan

Defendants contend that they are entitled to judgment as a matter of law on plaintiff's claims of false advertising and intentional misrepresentation with respect to his purchase of the Hadoscan machine.  Defendants wage a number of arguments, foremost of which is their contention that to the extent plaintiff was deceived about the performance capabilities of the Hadoscan, the perpetrator of that deceit was the machine's inventor, Hans

35

Schindler, and not any of the defendants.  Defendants assert that not only did none of them make any representations of fact about the machine's capabilities, but that they did not even know enough about the machine to have made such representations.

Plaintiff acknowledges that most of the misrepresentations about what the Hadoscan could do were made by Schindler, but he asserts that he relied on those representations only because of what defendants had told him about the device.  Plaintiff alleges that he relied on the following statements by defendants Hiro Emoto and Masaru Emoto "in believing that the Hadoscan really could help diagnose and heal patients' illnesses caused by irregular vibrations":

> 1) On April 6, 2006, Hiro Emoto informed him that I.H.M. would no longer be selling the Hado-R;
>
> 2) In his e-diary entry of March 9, 2006 and again at the Fourth Hado Instructor School, Masaru Emoto described the Etascan (which would later be renamed as the Hadoscan) as "one of the most advanced Hado devices that I have ever come across" and said that it might be "the ultimate Hado measuring device;"
>
> 3) At the Fourth Hado Instructor School, Masaru Emoto claimed that the Hadoscan had helped heal his pancreas; and
>
> 4) At the same Hado Instructor School, Emoto claimed that the Hadoscan was a breakthrough in Hado measuring devices because it could measure the Hado of words.

None of these statements gives rise to an implication of fraud.

I start with Masaru Emoto's statements. The first element of an intentional misrepresentation claim is that the party made "a statement of fact that is untrue." Kailin v. Armstrong, 2002 WI App 70, ¶31, 252 Wis. 2d 676, 643 N.W.2d 132. Defendants contend that even if Emoto's description of the Hadoscan as the "ultimate" and "most advanced" Hado-measuring device could be viewed as proposing a commercial transaction, those statements are not representations of fact but mere expressions of opinion or "puffery," statements which cannot be shown to be untrue and could not reasonably have been relied upon. Tietsworth, 2004 WI 32 at ¶41. I agree. A statement is not a representation of fact if it expresses mere opinions on quality, value, authenticity or other matters of judgment. Consolidated Papers, Inc. v. Dorr-Oliver, Inc., 153 Wis. 2d 589, 451 N.W. 2d 456, 459 (Ct. App. 1989). Thus, "[a] general statement that one's products are best is not actionable as a misrepresentation of fact." State v. American TV & Appliance of Madison, Inc., 146 Wis. 2d 292, 301-02, 430 N.W.2d 709 (1988). See also Tietsworth, 2004 WI 32 at ¶44 (manufacturer's representations that its motorcycles were of "premium quality" and a "masterpiece" were non-actionable commercial puffs); Loula v. Snap-On Tools Corp., 175 Wis. 2d 50, 54, 498 N.W.2d 866 (Ct. App. 1993) (statement that tool dealer would make as much money as doctor or lawyer amounted to puffery that could not support claim for common law misrepresentation). Defendant Emoto's statements that the Hadoscan was the "ultimate" or "most advanced" Hado-measuring device falls squarely into the domain of

37

puffery, because a factfinder would be unable to determine the truth or falsity of those claims.

Emoto's statement that the Hadoscan was capable of measuring the Hado of words also fails to give rise to an actionable claim for misrepresentation.  First, plaintiff has failed to introduce evidence from which a jury could infer that Emoto made that statement with the intent to induce plaintiff to purchase the Hadoscan.  Plaintiff has offered no evidence about where, when or to whom the statement was made, much less any evidence to suggest that Emoto's comment was targeted at plaintiff or made in the context of a proposed commercial transaction.  Second, because no reasonable adult listener could interpret the statement that the Hadoscan "could measure the Hado of words" as a statement of fact, plaintiff could not have relied reasonably on that representation in deciding to purchase the Hadoscan.  Finally, plaintiff claims in this lawsuit that defendants tricked him into believing that the Hadoscan could help to diagnose and heal patients' illnesses caused by irregular vibrations, not that they tricked him into believing that the Hadoscan could measure the Hado of words.  Therefore, Emoto's representation as to the Hadoscan's ability to measure the Hado of words is irrelevant.

This leaves Emoto's statement at a Hado Instructor School that the Hadoscan had helped to heal his pancreas.  Even assuming the falsity of this statement, again, plaintiff has not adduced enough evidence from which a jury could conclude that Emoto made the

statement with the intent to induce plaintiff to purchase or agree to distribute the Hadoscan. As with the "Hado of words" statement, plaintiff has offered no evidence about where, when or to whom the statement was made, much less any evidence to suggest that Emoto's comment was targeted at plaintiff.  The mere fact that Emoto was touting the marvels of the Hadoscan at a seminar to anyone who might be listening is not enough to show that in making the representation, Emoto intended to deceive plaintiff and induce him to purchase the Hadoscan.

Turning to Hiro Emoto's statement, defendants have offered no explanation why Hiro Emoto told plaintiff that I.H.M. was no longer selling the Hado-R when the product remained for sale on the company's website.  At the same time, however, plaintiff has not explained how this statement fits in to his claim that defendants misled him into believing that the Hadoscan really could help diagnose and heal patients' illnesses caused by irregular vibrations.  Plaintiff accuses defendants of engaging in a "bait and switch" scheme by falsely representing that the Hado-R was no longer available and then directing him instead to the Hadoscan, which they held out to be a "newer, improved Hado measuring device."  Plt.'s Br. in Supp. of Summ. Judg., dkt. #48, at 17.  But plaintiff has not alleged a "bait and switch" claim (nor could he, for such claims apply to advertising, <u>American TV</u>, 146 Wis. 2d at 303); he has alleged that defendants intentionally made false representations of fact that led him to believe that the Hadoscan really could help diagnose and heal patients' illnesses caused

39

by irregular vibrations.  Hiro Emoto's statement that I.H.M. would no longer be selling the Hado-R says nothing about the performance capabilities of the Hadoscan or even implies that the Hadoscan was somehow a "better" device than the Hado-R.  Therefore, it does not give rise to an actionable claim for misrepresentation.

In sum, plaintiff has failed to adduce evidence from which a jury could find that defendants made false representations of fact with respect to the performance capabilities of the Hadoscan that were intended to induce plaintiff to purchase or agree to distribute the Hadoscan.  Accordingly, defendants are entitled to summary judgment on plaintiff's claims for common law intentional misrepresentation and for misrepresentation under Wis. Stat. § 100.18.

Having concluded that plaintiff has failed to adduce evidence from which a jury could conclude that defendants made any false statements of fact that were intended to induce plaintiff to purchase either the Hado-R or Hadoscan or that plaintiff actually relied to his detriment on the statements that were made, it is unnecessary to address the other grounds defendants raise in support of their motion, including their contention that the economic loss doctrine bars plaintiff's common law claims.

### D.   Motion to Strike Count III of Amended Complaint

The only matter remaining is defendants' motion to strike count III of plaintiff's amended complaint, which adds a new cause of action for breach of contract. (Defendants did not have the opportunity to move for summary judgment with respect to this claim because plaintiff filed the amended complaint just days before the deadline for filing dispositive motions.)   This motion will be granted.   As an initial matter, plaintiff's contention that the amendment was authorized by this court's October 5, 2007 order is without merit.   As plaintiff acknowledges, the amendment contemplated in that order was to allow him to plead his fraud claim with the specificity required by Fed. R. Civ. P. 9(b). The failure to specify that such an amendment was the *only* type of amendment authorized was not an open invitation for plaintiff to add whatever new claims he saw fit.   The addition of an entirely new cause of action is a different matter from merely allowing plaintiff the opportunity to add more detail to a pre-existing fraud claim.   The former concerns were never addressed in the October 5 order.   Accordingly, plaintiff was required to file a motion under Fed. R. Civ. P. 15(a) before adding a new cause of action.   His failure to do so is reason enough to grant the motion to strike.

In any event, even if I were to give plaintiff the benefit of the doubt and construe his opposition to the motion to strike as a Rule 15(a) motion, I would deny it.   According to the rule, "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

41

"Although the rule reflects a liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice or if the pleading is futile." Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, 848-49 (7th Cir. 2002) (citing Foman v. Davis, 371 U.S. 178, 181-82 (1962); Bethany Pharm. Co. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001)).

In count III of the amended complaint, plaintiff has alleged that he entered into agreements with defendants to: 1) purchase Hado-R and Hadoscan machines; 2) purchase supplies, water and publications of defendants; 3) pay to attend Hado Instructor Schools and other seminars and meetings sponsored by defendants; and 4) market the Hado-R and Hadoscan machines and train others to operate those machines. Dkt. #37, ¶¶129-132. He further alleges that he entered into those agreements because of defendants' representations regarding the diagnostic and treatment capabilities of the Hado-R and Hadoscan MRA machines, which are the same representations on which he brings his fraud and false advertising claims. Id., ¶133. In light of my conclusion that plaintiff has produced no evidence that defendants actually made any factual representations "regarding the diagnostic and treatment capabilities" of either the Hado-R or Hadoscan machines in the course of the parties' commercial transactions, it would be futile to allow him to bring a breach of contract action that depends on the same failed proof.

42

ORDER

IT IS ORDERED that the motion of defendants Masaru Emoto, I.H.M. Co., Ltd.,

Hiro Emoto, and Hado Publishing USA for summary judgment on plaintiffs' claims of

intentional misrepresentation and violation of Wisconsin's Deceptive Trade Practices Act,

Wis. Stat. § 100.18 (counts I and II), is GRANTED.

Defendants' motion to strike or dismiss count III of plaintiffs' amended complaint

is GRANTED.


Entered this 9th day of January, 2008.


BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

43